```
              UNITED STATES DISTRICT COURT              FILED
                 DISTRICT OF SOUTH DAKOTA
                    SOUTHERN DIVISION                 JUN 09 2008
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| ANNE CRITES, | * | CIV. 06-4116 |
| | * | |
| Plaintiff, | * | |
| | * | FINDINGS OF FACT |
| vs. | * | AND |
| | * | CONCLUSIONS OF LAW |
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## BACKGROUND

This is a lawsuit under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680. A court trial was conducted on January 8 and 9, 2008. Plaintiff was personally present along with her lawyer Jeffrey Burns. The defendant was present through its postmaster Eileen Nenaber along with its lawyer Assistant U.S. Attorney Jan Holmgren. Six witnesses testified. Plaintiff's exhibits 1-5, & 9-12 and defendant's exhibits 101, 104-114, & 120-122 were received into evidence. The government moved for judgment as a matter of law at the conclusion of plaintiff's case and at the close of all the evidence. The motion was denied because questions of negligence, contributory negligence, and assumption of risk are questions for the fact finder.

## JURISDICTION

Jurisdiction is pursuant to 28 U.S.C. § 1346(b)(1). The parties consented to have the case handled by the Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1).

## FINDINGS OF FACTS

### Anne Crites.

Anne Crites is a 61 year old female who resides in Phoenix, Arizona. She began working for the postal service in 1979 as a letter carrier in Texas. The same year she and her husband moved

to Colorado where she again worked for the postal service as a letter carrier. She was also in the "active duty military reserves." In 1992 she moved to Rapid City, South Dakota, where she continued working for the postal service and continued her military career at Ellsworth Air Force Base. She retired from the postal service in 2003 with 28 years of service. She retired from the reserves with 24 years of service. She has had several surgeries and suffers from chronic arthritis. Nonetheless, she exercised, maintained her strength, and ate nutritiously.

In 2002 she was working in Huron, South Dakota in the mail processing facility called Dakota Central. Her job responsibilities took her all around the plant and required lifting above the shoulders. She was, however, limited by a medical doctor from lifting higher than her shoulder level. She developed back problems. A bulging disc was diagnosed. She had sciatic nerve pain down the right leg for which she received a series of epidural injections. The injections did not help, but one day she removed the lift from her old pair of shoes while inserting her orthotic inserts and the pain disappeared in about three weeks. A repeat x-ray showed the bulging disc had disappeared. She also experienced pain in her right shoulder. The diagnosis was reflex symptomatic dystrophy, which means the nerves were not working correctly because they had been pinched. She could differentiate pain from these conditions from other pains in her body.

For virtually her entire life she has treated with a chiropractor. She also suffers from fibromyalgia and experiences pain relief from massages. The pains she experienced from the bulging disc interfered with her physical activities and work. After the pain disappeared following the removal of the lifts from her shoes she was able to resume her physical activities and work without pain. She exercised at Curves.

She retired from the post office effective November 1, 2003. She felt tremendous after retiring. She hadn't felt so good in years. Her only ongoing limitation was raising her arm over her shoulder. In mid-November she began working at RadioShack in Huron. Her friend was the owner

and needed help at the store. Mrs. Crites worked part time. Her job required lifting heavy objects.

January 31, 2004, was her last working day at RadioShack until she returned to work there in October 2004. She attended a Saturday morning work meeting until about 10 or 10:15 a.m. From there she went to the post office. The conditions were icy, but there was not fresh snow. It was not snowing. She went to the post office to pick up a package she was expecting. She parked in a parking lot on the south side of the post office building. The front of the building faces west. She walked from the car to the front of the post office. She found the steps to be very icy, so she held the center handrail as she walked up the steps.

Exhibit 11 is a set of pictures of the steps. The photos were taken on February 2, 2004, two days after Mrs. Crites fell. The photos do not depict the actual ice and snow condition of the steps at the time of her fall, but they do accurately depict the steps themselves. Mrs. Crites described the ice as very smooth and thick. She remembers thinking the condition was not very safe. She held onto the rail as she ascended the steps without incident. She checked her post office box upon entering the post office and found a package notice. She then waited at the end of the line to approach the clerk on duty at the window. Her package was collector stamps. The package was packaged like an LP album. She was also holding other mail and perhaps another package as she left the post office to walk down the steps. She tucked these items against her with her right hand (she is left hand dominant) and held the rail with her left hand. "One second I was standing and the next I was on my back." She is not sure where she landed on the steps. She recalls simultaneously hitting the edges of three steps with her back, her rib, and her head. She recalls feeling sharp pain which was bearable so long as she did not move. She recalls feeling like she was in a twilight zone, like things were hazy. She could hear voices which sounded like they were off in the distance. She recalls unknown people trying to help her and talk to her, but she cannot recall what they said or did. She recalls a lady asking for her car keys so she could take Mrs. Crites' mail and packages to her

3

Dodge Durango for her. She returned with the car keys. Mrs. Crites does not know who the person was. Mrs. Crites was not responding to anyone or anything.

Later Judy from the post office came out. Mrs. Crites recalls being told to get up by Judy. Mrs. Crites did not respond and continued lying there. Eventually an ambulance arrived. She was placed on a backboard and taken to the hospital. She does not recall conversation with the ambulance personnel. She was examined at the emergency room by a physician's assistant who ordered X-rays to be taken. The P.A. said "you're fine. You can go home." She had been at the emergency room about a couple of hours.

A friend and her husband picked up Mrs. Crites' Dodge Durango from the post office and picked up Mrs. Crites from the emergency room. They took her to her home, placed her into her recliner, and got her something to eat and drink. They put some "stuff on the table by my recliner so I wouldn't have to try to get anything." Her friends left after a little bit.

Mrs. Crites called Debbie, the owner of RadioShack, on Sunday to tell Debbie she would not be able to come to work that day. Debbie came to Mrs. Crites' home after work and stayed the night. She came back the next night after work to make sure Mrs. Crites was okay. Mrs. Crites continued to feel pain around her lower left ribs and her back. She slept and "kind of lived in the recliner for the first week." Debbie placed food and drink on the table by the recliner for her and helped her to the bathroom.

Mrs. Crites called her chiropractor, Dr. Carr, at home on Sunday the day after the fall. He said he could see her that day if she really thought it was necessary, but suggested that it sounded like there was swelling and that he would be able to tell far more about her condition if she waited a few days for the swelling to go down. She went to see Dr. Carr on Tuesday. Debbie and her husband took her because she could not yet drive herself. They continued to give her rides to see Dr. Carr for about a week.

She did not work for about 36 weeks. She had planned and paid for a trip to Florida for a convention before her fall occurred. She discussed taking the trip with Dr. Carr. She understood from her conversation with Dr. Carr that warmth and sunshine would do her more good "than sitting up here in the cold." She made the Florida trip. She was able to walk and drive while in Florida, but she did not attend the convention after the first morning. She found the steps and the chairs more than she could handle.

Upon her return to South Dakota from Florida she continued to treat with Dr. Carr until April when she went to Seattle. She went to Seattle to house sit and baby sit animals for her cousin. She did not treat with a chiropractor while in Seattle because the chiropractor's charges would not be covered by insurance. Instead, she found a physical therapist whose charges were covered by her insurance. She remained in Seattle about four months. She returned to Huron in August, 2004, and resumed treatments with Dr. Carr at that time. Her condition had improved significantly by September, 2004. She returned to work at RadioShack in October, 2004.

She earned $5.25 per hour and worked 25-30 hours per week at RadioShack. She was able to perform all of her job responsibilities. She quit working at RadioShack in July, 2006, to accept a job a Wal-Mart. Her hire date at Wal-Mart was May 18, 2006, but she continued working at RadioShack until the Wal-Mart store opened.

Mrs. Crites is claiming $8,885.23 in medical expenses as a result of her fall. Mrs. Crites testified that she is claiming $75,000 in this lawsuit.

On cross examination it was established that on the day of the fall there was some ice on the parking lot at RadioShack. She did not use her windshield wipers as she drove to the post office. She checked her post office box a minimum of three times a week. She has probably been at the post office 700-800 times. She was familiar with the steps. She has used the same door she used on the day of the fall many times. She does not know whether it snowed or rained the night before

5

her fall. She does not remember there being any snow on the steps. She does not recall telling anyone inside the post office that the steps were icy after walking up the steps and entering the post office. The ice was smooth, glare ice. She saw no salt on the ice. She saw other people in the post office that day. She does not know whether any of them saw her fall. She does not know where she lost her footing.

Her custom was to get a chiropractic adjustment from Dr. Carr once a month whether she needed one or not. She drove to Seattle by herself in early April, 2004. She drove from Seattle back to Huron by herself in August.

### Dr. Carr.

Dr. Carr is a licensed chiropractor who with other partners operates five clinics. He practices primarily in Huron, Redfield, and Miller, S.D. He has practiced for nineteen years. Anne Crites has been one of his patients since March 21, 2002. He saw her after her fall for the first time on February 3, 2004. She was in pain which she rated as 9 on a scale of 10 with movement and 4 without movement. Dr. Carr observed swelling and bruising over the left inferior rib cage area and through the dorsolumbar and glute region. He took x-rays and found a transverse process fracture at the left L-1 region, but did not show any rib fracture. He treated her and placed her in a Bragg lumbosacral support. This is a very painful fracture. By February, 27, 2004 she felt 60% better. He performed an impairment rating on August 24, 2004. He assessed a 10% whole person impairment rating.

On cross examination he testified that Mrs. Crites could resume working out at Curves by February 17. She could start looking for light secretarial work by April 6. She was not living a pain free life prior to her fall. She was 90-95% better when he performed his impairment rating in August.

### Dr. Blow.

Dr. Blow is a physical medicine and rehabilitation physician who has practiced for fourteen years after completing his three year residency. He is certified in independent medical exams and impairment ratings. He performed an independent medical examination on Anne Crites at the request of the United States Attorney. He testified that Mrs. Crites visited a chiropractor 22 times in 2002, 32 times in 2003, 26 times in 2004, and 26 times in 2005. Her care after receiving her impairment rating "begin[s] to look a lot like what it was before." Her physical exam looked very good. She had good muscle tone that was symmetric in her thoracic and lumbar spine. She had normal strength. Her reflexes were normal. Her spinous processes were not tender. She was a little sore on the outside of the hip. She walked with a "pretty normal gait." "She is doing fairly well and is functioning at the same level she was before the injury as after." An undisplaced fracture of the transverse process is not an impairing condition, so it doesn't qualify for an impairment according to the American Medical Association. Her functional level is at the pre-injury status. There is no impairment. He agrees that her injuries would be painful and disabling for a period of time.

### Judy Boomsma.

At the time of Mrs. Crites' fall Judy Boomsma was the supervisor at the downtown post office in Huron. She had been in that position since 1997. There were two management employees in Huron, the postmaster and the supervisor. There were two persons who comprised the maintenance staff. She was in charge of making the decision to remove snow. "Common knowledge would tell you, if there's snow, it needs to be removed." Ice melt is commonly used if the conditions are icy. Normally the maintenance people would remove snow or ice from sidewalks and steps. The parking lots are cleared by contractors. The maintenance staff would know without being told whether ice melt should be placed.

She was working on Friday, January 30, 2004, the day before Mrs. Crites fell. She does not recall the weather conditions that day. Both maintenance employees were on duty. She does not know whether there was maintenance on the sidewalk or steps on Friday. She doesn't recall checking to see whether the sidewalk and steps needed maintenance on Friday.

The post office is open to the public on Saturdays from 9 a.m. to 11 a.m. She worked Saturday as well, arriving about 6:30 a.m. She entered the entrance on the south side of the post office. She believes she walked up the ramp and believes that ice melt had been applied by the time of her arrival. She, however, is not sure whether there was ice melt on the ramp as she walked up the ramp Saturday morning. Three clerks arrived before her that morning. Neither of the two maintenance staff was working that Saturday. Their job tours were Monday through Friday, so they never worked on Saturday.

She believes she checked the condition of the front steps and sidewalk about 7 a.m. She opened the door from the inside, stepped out and looked down the steps. "There was some drifting snow, blowing and drifting snow that was causing some snow on the steps. So I went down into—there's stairs down into the basement is where we keep some ice melt out in the lobby, and got some ice melt and went and sprinkled it on both the north steps and the west steps." She applied ice melt to the steps and to the sidewalk. This occurred about 7:15 a.m.

At her pretrial deposition she testified she scooped snow. Counsel showed her a report she prepared two days after Mrs. Crites fell in which she said she did not scoop snow. At trial she agreed with what she wrote in her report, i.e. that she did not scoop snow Saturday morning before Mrs. Crites fell. "There must have been some form of moisture—snow, a light snow cover, ice—that I would put down ice melt to help to clear the steps," but she does not recall. She does, however, recall placing ice melt.

Later that morning one of the window clerks, Kim Schnabel, told her that someone had fallen down the front steps. Judy Boomsma went outside to see "what the situation was." She saw a person lying at the bottom of the steps "kind of onto the sidewalk." She asked Mrs. Crites if she could get up and was told no. She asked if Mrs. Crites would like an ambulance. Mrs. Crites said yes. Judy Boomsma went inside the post office and called for an ambulance. She then went to her car and got a blanket to put over Mrs. Crites. Exhibit 2 is the accident investigation worksheet (PS Form 1700) Judy Boomsma prepared. Pictures were not taken the day Mrs. Crites fell. Judy Boomsma believes the reason was dead camera batteries. Pictures were taken the following Monday, February 2, 2004. Ex. 11.

On a report form Judy Boomsma reported the weather conditions were cloudy. She did not choose the options for snow or sleet or rain. The steps were concrete.[1] She indicated there was snow on the steps. Her trial testimony described the snow as "a light drifting of snow from the snow that had been on the sides." Her narrative on the report includes this description: "[t]he hazardous situation that was directly related to the accident was snow on the steps that had blown in and was melting from ice melt that had been put down prior to the additional light snow on top." She testified the snow was blowing snow from the wind, not new snow. This report is dated January 31, 2004, the Saturday of Mrs. Crites' fall.

The report was not finished until February 2, 2004, the following Monday. The report also includes the following: "[t]he steps had a light cover of new snow and some blown-in-snow on them with salt underneath making them somewhat loose and unstable." The report also indicates the steps are going to be replaced this spring "as they are falling into building leaving large cracks and also

---

[1] There is testimony from Eileen Nenaber, the postmaster, that the steps are granite. It is not material to the decision whether the steps are concrete or granite.

lower spots that fill with water, snow, ice." The report also indicates the salt that had been applied together with the blown in snow made "the snow melt slick and hard to get [a] grip." The area where the steps were cracked and worn was on the top of the landing where the steps met the building, not on the bottom landing where Mrs. Crites fell.

Judy Boomsma wrote on the accident report, PS Form 1769 (Ex. 1) "[t]he hazardous situation that was directly related to the accident was snow on the steps that had blown in and was melting from ice salt that had been put down prior to the additional light snow on top."

### Kim Schnabel.

Kim Schnabel was an acquaintance of Anne Crites and a co-worker with her at Dakota Central Post Office. She was working as a window clerk the day Mrs. Crites fell. From that vantage point she was not able to see the steps on the west side of the post office. The foot traffic at the post office that morning was about average, perhaps a bit slower than average. There was no one at her window when someone came inside and told her a person was lying on the steps. Before that no one had mentioned that the steps were slippery. Anne Crites herself did not mention to Kim Schnabel that the steps were slippery when Anne Crites had come to Kim Schnabel's window to pick up her package. The person who reported that Anne Crites was lying on the steps did not mention that the steps were slippery. When Kim Schabel went outside and walked down the steps to see about the person lying on the steps she does not recall slipping. She did not see anyone else slip on the steps.

### Eileen Nenaber.

Eileen Nenaber is the postmaster at Huron. The steps have been replaced since Mrs. Crites' fall because they were falling in toward the building. The steps are granite. Twice before they had been turned over and ground down to fit the building. Then they "were getting to the point where

they no longer fit the building and it was causing those cracks Judy spoke of." The old steps were buried in the ground underneath the new steps.

### Weather Report.

The weather report was received into evidence as Ex. 101. The report reveals:

Friday, January 30:

> maximum temperature — minus 17.8 Celsius (converted to Fahrenheit = minus 0.04)
> minimum temperature— minus 22.8 Celsius (converted to Fahrenheit = minus 9.04)
> wind— 18 -24 mph
> 24 hour precipitation water equivalent— 0.04 inches

Saturday, January 31:

> maximum temperature— minus 10.6 Celsius (converted to Fahrenheit = plus12.92 )
> minimum temperature— minus 18.3 Celsius (converted to Fahrenheit = minus 0.94)
> wind— 24-30 mph
> 24 hour precipitation water equivalent not recorded
> precipitation between 0655 military time and 1055 military time— 0.00

### The Steps.

The photos of the steps (Ex. 11) reveal, beginning at the sidewalk level and going up, what appear to be three deep and wide steps, then a landing, then five more deep and wide steps, with a landing in front of the door at the level of the fifth step. There is a railing in the center which serves as a handrail. There are also railings along both sides of the steps.

## DISCUSSION

### Government's Arguments.

The government urges the claim is barred by Mrs. Crites' contributory negligence and assumption of risk. The government urges Mrs. Crites could have used the south entrance instead of the main west entrance. Doing so would have avoided using the steps if they were slippery. Because she did not, she assumed the risk just like the South Dakota Supreme Court said of the plaintiff who jumped from a car while it was still moving. Goepfert v. Filler, 563 N.W. 2d 140 (S.D.

1997). "He had a reasonable alternative of staying in the car until it reached a complete stop. No one forced him to jump from the car." The government also referenced a case where the plaintiff stepped on an unstable pile of lumber when there were other reasonable alternatives to stepping on the lumber. Myers v. Lennox Co-op, 307 N.W.2d 863, 865 (S.D. 1981). The government also argues that a landowner is not liable to pedestrians for injuries resulting from a fall after slipping on ice or snow which naturally accumulates on a sidewalk. Budahl v. Gordon & David Associates, 323 N.W.2d 853 (S.D. 1982). The governmental also argues the landowner cannot be liable unless the landowner is on notice of a "perilous instrumentality" and the plaintiff is not on notice. Ewing v. United States, 231 F. Supp. 1001 (D.S.D. 1964). According to the government Mrs. Crite's case is one where the government did not know of a slippery condition but Mrs. Crites did. The government urges they can be liable for negligence, but strict liability does not apply. So, the government is not held to a duty of keeping the steps completely free and clear of snow and ice. Morrison v. Mineral Palace, 603 N.W.2d 193, 197 (S.D. 1999). Even if the government was negligent, the government argues Mrs. Crite's claim is barred because her contributory negligence was more than slight when compared to the assumed negligence of the United States. She failed to exercise due care for her own safety by encountering steps that she knew were icy, according the government.

### Plaintiff's Arguments.

Mrs. Crites was a resident of Huron, S.D. when this lawsuit was commenced (Doc. 1). She alleged in her complaint that post office employees were negligent in that they failed to use reasonable care to remove snow and ice from the post office steps, failed to use reasonable care to maintain the steps after previous applications of snow and ice remover, that they failed to properly apply snow and ice remover on the day Mrs. Crites fell, and allowed the steps to remain in a

slippery, hazardous and unsafe condition (Doc. 1). She submitted her claim to the U.S. Postal Service, but the claim was denied (Doc. 1). A landowner owes its invitee the duty of using ordinary care for the safety of the invitee. Luther v. City of Winner, 2004 SD 1 ¶ 19. Plaintiff argues "the post office was required to either insure that the steps were adequately cleared or advise the public that they had not been cleared and a dangerous situation existed" (Doc. 40, p. 2). The investigation Form 1700 (Ex. 2) reveals that "no snow or ice removal had been undertaken on January 31, 2004" (Doc. 40, p. 3). Plaintiff points to inconsistencies in the testimony of Judy Boomsma about scooping snow and not scooping snow and placing ice melt (Doc. 40, p. 4).

## ANALYSIS AND CONCLUSIONS OF LAW

That a slip and fall occurred and Mrs. Crites was injured as a result does not give rise to an inference that the fall was caused by the negligence of anyone. Delvechhio v. Lund, 293 N.W.2d 474, 476-77 (1980). Mrs. Crites was an invitee on the premises of the U.S. Post Office at Huron, South Dakota when she fell. Small v. McKennan Hospital, 437 N.W.2d 194, 199 (S.D. 1989), SD Pattern Instruction 120-05. Defendant owed her a duty to exercise reasonable care for her safety. Luke v. Deal, 629 N.W.2d 165 (S.D. 2006), SD Pattern Instruction 120-06. A possessor of land can be liable to an invitee for injuries suffered by a condition on the land if, but only if, the possessor (a) knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to the invitee, (b) should expect the invitee will not discover or realize the danger, or will fail to protect herself against it, and (c) fails to exercise reasonable care to protect her from the danger. Restatement (Second) of Torts § 343 & 343A. A possessor of land is not liable to an invitee for injury caused by any condition on the land whose danger is known or obvious to her, unless the possessor should anticipate the harm despite her knowledge or obviousness. Id. If the possessor of land has reason to believe the condition will harm the invitee

despite its obviousness, the possessor has a duty to warn her regarding the condition or to take other reasonable steps to protect her. Luther v. City of Winner, 674 N.W.2d 339 (S.D. 2004), SD Pattern Instruction 120-07. A possessor of property is not liable to pedestrians for injuries resulting from a fall caused by the natural accumulation of snow and ice on a sidewalk in front of the property. Budahl at 323 N.W.2d 853, 855. Negligence is the failure to use reasonable care, i.e. doing something which a reasonable person would not do or the failure to do something which a reasonable person would do in the same situation. SD Pattern Instruction 10-01. Mrs. Crites bears the burden to prove the post office was negligent in maintaining its steps.

The weather report reveals that over the two days Friday and Saturday, January 30 and 31, there was no material precipitation (0.04 water equivalent). The winds blew from 18 to 30 miles per hour. The temperatures ranged from minus 10 degrees to plus 13 degrees Fahrenheit (rounded). There is a code entry for the amount of accumulated snow on the ground but the code translations are not included with the exhibit, so the amount of accumulated snow on the ground is unknown. Between 6:55 a.m. and 10:55 a.m. on Saturday, January 31, 2004, there was no precipitation.

Mrs. Crites testified she observed ice on the steps, so thick, smooth and slippery that she changed her usual custom of ascending and descending the steps. She moved toward the handrail and held it as she ascended and descended the steps.

There was no fresh snow or sleet or rain. The only evidence about snow on the steps is that the snow on the steps was a light dusting of snow from snow which had previously accumulated on the ground and was blowing around. The ice could have formed only from thawing snow which formed moisture which then froze. The temperature was below freezing between about 7:15 a.m. when Judy Boomsma applied ice melt and about 10:40 a.m. when Mrs. Crites fell. It is concluded that ice was present at that time. Mrs. Crites testified ice was present. Judy Boomsma said she

placed ice melt. There would be no reason to place ice melt if snow or ice were not present.

Judy Boomsma, the person responsible for maintaining the steps that Saturday, could reasonably believe the ice melt she placed would reasonably address the ice accumulation issue. It is concluded the ice melt she placed caused melting of the snow and ice upon which it was placed. There is no evidence to explain how long the ice melt would continue to keep the snow and ice melted. There is no evidence to explain if or when the application of ice melt would no longer be effective and if or when the moisture caused by the ice melt would freeze into ice. There is no evidence to suggest how long the newly frozen ice had been present.

Others who came to the post office that Saturday did not complain about slippery conditions. There is no evidence to describe the extent of the ice, i.e., whether the ice was a small patch of ice or whether ice completely covered the steps, or something in between those two descriptions. There is no evidence to describe the ice upon which Mrs. Crites stepped which caused her to slip and fall. Indeed, there is no testimony that it was ice which caused her to slip and fall, although that fact is inferred. The extent of the evidence is "[o]ne second I was standing and the next I was on my back."

There is no evidence to suggest the ice was formed by moisture which collected in the cracks of the steps or pooled in low spots on the steps. The evidence is Mrs. Crites fell at a location different from the location where the cracks and low spots were located. The depressions and cracks were at the top of the steps where the steps were settling toward the building. Mrs. Crites fell at the bottom of the steps. There is no evidence to suggest the ice formed as a result of unnatural conditions. The evidence is the snow was naturally fallen snow. The artificial component was the application of ice melt, which is a reasonable and usual method of addressing naturally slippery conditions which result from an accumulation of naturally fallen snow.

It was reasonable for Judy Boomsma to place the ice melt. It was not currently snowing, sleeting, or raining when she placed the ice melt. The weather did not materially change after she placed the ice melt and before Mrs. Crites fell about 10:40 a.m. Like Mineral Palace, it would be unreasonable to expect the post office to keep the steps clear of every threatening deposit of snow or ice every minute of the day or night. The post office satisfied its duty to maintain the steps by Judy Boomsma's 7:15 a.m. inspection and placement of ice melt. The post office could reasonably expect patrons to discover the conditions present on the steps and to protect themselves against those conditions. Judy Boomsma, the employee and agent of the post office, did not do something a reasonable person confronted with the same circumstances would not do. Conversely, she did not fail to do something that a reasonable person would have done in like circumstances. The post office was not negligent. Mrs. Crites fall, unfortunate though it was, was not caused by negligence of the post office.

It is ORDERED that judgment shall be entered in favor of the defendant and that plaintiff's complaint shall be dismissed with prejudice.

Dated this 9th day of June 2008.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, Clerk

By Colleen Schulte, Deputy

(SEAL)